TRANSMARINE    CORPORATION    v.
CHARLES H. LEVITT & CO., Inc.

Circuit Court of Appeals, Second Circuit.
March 12, 1928.

No. 193.

1. **Shipping ☞106(1)—Bill of lading issued subsequent to oral contract at time goods remained within recall constituted only contract.**

Bill of lading issued and accepted subsequent to oral contract and at time when goods still remained within recall for carriage of goods from Newark to Havana constituted the only contract between parties, and took place of prior oral contract as final memorial of parties' obligation.

2. **Evidence ☞222(2)—Carrier's statements at time of oral contract held competent as admission on issue of reasonable dispatch of goods under subsequent bill of lading.**

In determining reasonable dispatch of goods under bill of lading issued subsequent to oral agreement for carriage, statements made by carrier at time oral contract was made *held* competent proof by way of admission as to facts existing in port of delivery and as to carrier's facilities for forwarding goods, since issuance of bill of lading did not exonerate carrier from reasonable dispatch.

3. **Shipping ☞132(1)—Buyer consignee, after delivery of goods to carrier, has right of action for breach of contract of carriage.**

Buyer consignee, after title to goods has passed by delivery to carrier, has right of action against carrier for breach of contract, since after title passes seller has nothing to do but collect contract price when it became due.

4. **Shipping ☞132(1)—Buyer consignee alone has right of action against carrier for breach of contract of carriage while contract of sale remains in existence.**

While contract of sale of goods remains in existence after delivery of goods to carrier for shipment, buyer consignee alone has right of action against carrier, since seller cannot prove

damages for breach of contract of carriage while contract of sale is still outstanding.

**5. Shipping ⊚⟶132(1)—Seller may recover for breach of contract of carriage after rejection of goods by buyer.**

After buyer's rejection of goods because of delay in shipment, seller has right of action for damages against carrier for breach of contract of carriage.

**6. Shipping ⊚⟶120—Seller's agreement to indemnify carrier for merchandise surrendered after failure to ship did not release carrier from breach then existing.**

Seller's indemnity agreement at time of taking possession of goods after carrier's failure to ship with reasonable dispatch, whereby he agreed to indemnify carrier only against claims made for merchandise, *held,* limited to claims arising from the surrender thereof, and did not release carrier from breach of contract of carriage then existing.

**7. Shipping ⊚⟶120—Seller's agreement to indemnify carrier against claim on account of refund of freight did not release carrier from existing breach of contract.**

Seller's agreement at time carrier repaid freight on articles which it had failed to ship with reasonable dispatch to indemnify carrier against any claim which should be made on account of return of such moneys *held,* not to operate so as to release carrier from liability for breach of contract of carriage then existing.

**8. Shipping ⊚⟶140(2)—Limitation in bills of lading as to value held ineffective, where carrier had no alternative rates.**

Where carrier had no alternative rates, limitation in bills of lading as to value of goods *held,* ineffective as bearing on liability for breach of contract of carriage.

**9. Dismissal and nonsuit ⊚⟶58(5)—Variance is not ipso facto ground for dismissal (New York Civil Practice Act, § 434).**

Variance between pleading and proof is not ipso facto ground for dismissal within New York Civil Practice Act, § 434, to effect that a fatal variance occurs only in case allegation is not proved in its entire scope and meaning.

**10. Appeal and error ⊚⟶236(2)—Point relative to variance is not well taken, in absence of motion to dismiss complaint at close of case.**

Point relative to variance between pleading and proof is not well taken, in absence of motion to dismiss complaint at close of the whole case.

**11. Shipping ⊚⟶131—Damages for delay in carriage of goods is difference in market value at time goods should have been delivered and when in fact they were.**

Proper measure of damages for delay in carriage of goods is difference in market value of goods when they should have been delivered with reasonable dispatch and when in fact they were.

**12. Shipping ⊚⟶132(6)—Crowded condition of harbor, making dispatch of goods difficult, constituted question of fact relative to delayed delivery.**

In determining question relative to whether goods were transported with reasonable dispatch, crowded condition of harbor, making dispatch of goods difficult, constituted question of fact relative to how much delivery should have been delayed thereby.

**13. Shipping. ⊚⟶132(5)—Communications of carrier's agents held properly excluded, in action for damages resulting from failure to transport goods with reasonable dispatch.**

In action for damages resulting from failure to transport goods with reasonable dispatch, testimony of communications to carriers by its agents as to conditions at port of delivery *held,* properly excluded, since carrier was charged with knowledge of its agents, regardless of their statements.

**14. Shipping ⊚⟶132(3⅝)—Shipper suing for damages for failure to transport goods with reasonable dispatch has burden of proving loss.**

Shipper suing for damages because of carrier's failure to transport goods with reasonable dispatch has burden of proving loss resulting, and any doubt must be resolved. against him.

**15. Shipping ⊚⟶131—Interest on damages for failure to transport goods with reasonable dispatch held properly allowed from date damages were certainly calculable.**

In action to recover damages for carrier's failure to transport goods with reasonable dispatch, trial court, in exercise of sound discretion, properly allowed interest from date damages were certainly calculable by resort to available basis of estimate.

In Error to the District Court of the United States for the Southern District of New York.

Action by Charles H. Levitt & Co., Inc., against the Transmarine Corporation. Judgment for plaintiff, and defendant brings error. Affirmed on condition of remittitur.

Writ of error to a judgment of the District Court for the Southern District of New York in favor of the plaintiff upon the verdict of a jury.

The complaint was laid upon an oral contract between the parties, by which the defendant in September, 1920, promised to carry 75 cases of the plaintiff's knit goods from Newark· to Havana in its ship, the Surailco. It alleged that the defendant had received the cases and delayed for an unreasonable time to dispatch them to Havana, that the plaintiff undertook on its own part to forward them, that the buyers rejected them on their arrival, and that the goods, being seasonal in character, fell in value. For the ensuing loss the plaintiff asked its damages. The answer, besides denying the. allegations of the complaint, alleged that the goods were shipped under bills of. lading which excused the delay. because the harbor of Havana was too ·crowded to allow

the ship's discharge, and further that the contract had been rescinded. The jury brought in a verdict for the plaintiff "with interest," which the judge directed to run from the date at which he thought the plaintiff's damages were certainly calculable by resort to available bases of estimate.

The facts, as the jury might have found them from the evidence, were as follows: The plaintiff, a dealer in woolen goods in New York, made certain contracts in Cuba for the sale of his goods in the spring of 1920, deliverable during the months of October and November. He contracted orally with the defendant in September, 1920, for the carriage of 75 of these cases by the steamship Surailco from Newark to Havana. The terms of this oral contract it is unnecessary to state. The defendant took the goods from New York to its warehouses in Newark between September 21st and 24th, where they lay until after October 20th, by which time they had been in part laded upon another of its ships. Meanwhile, on October 5th, all the cases being still ashore, the defendant issued and the plaintiff accepted straight bills of lading ("to be transported"), requiring delivery to the buyers. The plaintiff made constant complaint at the delay after October 20th, finally demanding back the goods on November 8th, that it might transship them by another line. On November 30th the defendant complied with the demand and redelivered 74 of the 75 cases, one having been lost.

Three of the buyers had already rejected 11 cases because of the delay, of which the plaintiff later disposed in part as best it could, and still held the rest at the time of trial. The other 63 cases it forwarded by the ship of another line, which reached Havana on December 9th and was discharged within three days. The buyers rejected all these cases upon the plaintiff's tender, because about the middle of December the market for such goods in Cuba, where alone they were salable, had disappeared. The plaintiff finally prevailed upon some of the buyers to take their consignments at reduced rates, sold some in Cuba, and eventually reshipped the rest to New York, where they remained unsold at the time of trial.

As a condition of surrendering the goods, on November 30th the defendant demanded and the plaintiff executed on December 1, 1920, an agreement to return the bills of lading to the defendant, to indemnify it against "any claim" that "should be made for the merchandise by the persons holding the same on such bills of lading" and "to pay to them for such merchandise." In the following March he received back the freight in consideration of an agreement "to indemnify" the defendant "against any and all claims of any person or persons" and from all damages and suits "on account of the return of such moneys."

House, Grossman & Vorhaus, of New York City (Robert C. Beatty, Louis J. Vorhaus, and Joseph Fischer, all of New York City, of counsel), for defendant in error.

Kirlin, Woolsey, Campbell, Hickox & Keating and Stroock & Stroock, all of New York City (M. J. Stroock, Henry P. Elliott and Robert S. Erskine, all of New York City, of counsel), for plaintiff in error.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). [1, 2] We agree that the bill of lading was the only contract between the parties, and that it took the place of the prior oral contract as the final memorial of the parties' obligations. The Delaware, 14 Wall. 579, 20 L. Ed. 779; The Caledonia, 157 U. S. 124, 139, 15 S. Ct. 537, 39 L. Ed. 644; Guillaume v. General Transp. Co., 100 N. Y. 491, 498, 3 N. E. 489 (semble). When the goods have once been dispatched under an oral contract and are beyond recall, the issuance and acceptance of a bill of lading has been treated not to substitute it as the contract. Burns v. Burns, 131 F. 238 (C. C. A. 2); Park v. Preston, 108 N. Y. 434, 15 N. E. 705; Guillaume v. Gen. Transp. Co., 100 N. Y. 491, 3 N. E. 489. But this was not such a case. The goods still remained within recall, and indeed the plaintiff later recalled them. However, we can see nothing in the objection, because the bill of lading did not exonerate the defendant from reasonable dispatch and that was the issue that the judge left to the jury. It is quite true that he allowed them to consider, in determining what was such dispatch, the statements made by the defendant when the oral contract was made; but that was competent proof, by way of admission, as to the facts existing in Havana and as to the defendant's facilities for forwarding the goods. All that the defendant could ask was that the bill of lading should be taken as the measure of its obligation, and the only possible error would have been to impose upon it the period fixed by the oral contract and not contained in the bill of lading. This the judge did not do.

[3, 4] A much more serious question is the plaintiff's right to sue at all. He was the

consignor under a contract which both sides admit was fully performed by delivery to the defendant. The title having passed, he had nothing to do but collect the contract price when it became due. In that situation it has long been the law that the buyer consignee has a right of action against the carrier. Lawrence v. Minturn, 17 How. 100, 15 L. Ed. 58. And no one suggests the contrary. That the seller consignor cannot also sue is not so well settled. The more general rule is that he cannot. Blum v. Caddo, Fed. Cas. No. 1573; Krulder v. Ellison, 47 N. Y. 36, 7 Am. Rep. 402; Union Pac. R. R. v. Metcalf, 50 Neb. 452, 69 N. W. 961; Warren & O. V. Ry. v. So. Lumber Co., 115 Ark. 221, 170 S. W. 998; Clark v. Louisville & N. R. R., 216 Ala. 637, 114 So. 295. Though in Massachusetts the law is the other way. Blanchard v. Page, 8 Gray, 281; Finn v. Western R. R., 112 Mass. 524, 17 Am. Rep. 128. And the same was held in Georgia. Carter v. So. Ry., 111 Ga. 38, 36 S. E. 308, 50 L. R. A. 354. What damages the seller consignor can prove upon the breach, while the contract of sale is still outstanding, it is impossible to see. His right of action is a complete indemnity. On the other hand, the contract of carriage is made for the sole benefit of the buyer consignee, and is part of the consideration for his promise to pay the price. Whatever doubts may in general exist as to the rights of a beneficiary to sue upon a contract made in his interest, it is settled, at least for us, that, if he is the sole beneficiary, he may do so. Hendrick v. Lindsay, 93 U. S. 143, 23 L. Ed. 855; National Bank v. Grand Lodge, 98 U. S. 123, 25 L. Ed. 75 (semble). Penn. Steel Co. v. N. Y. City Rys. Co., 198 F. 721, 748 (C. C. A. 2), semble. Therefore we think that the buyer consignee, and he alone, can sue while the contract of sale remains in existence.

In the case at bar, therefore, before the rejection of the 11 cases in Newark, the Cuban buyers alone could have sued. When three of the buyers rejected the goods, and the plaintiff accepted them back, his relation to them changed. The rejection was a breach on which he might have sued, refusing to recognize the buyer's attempt to return the title, and if he had adopted this course this action would still not have lain. He must have worked out any rights against the carrier either after judgment or by garnishment. But by accepting the rejected goods he lost any rights to sue upon the contract and was restored to title. It has been held, whenever this situation arose, that the cause of action against the carrier was ap-

purtenant to the title and followed it back to the seller upon his acceptance, American Railway Express v. Island & Gypsum Fruit Co., 300 F. 311 (C. C. A. 6); Savannah, Florida & Western Ry. v. Commercial Guano Co., 103 Ga. 590, 30 S. E. 555; Anderson v. American Ry. Express, 187 N. C. 171, 121 S. E. 354. In Clute v. Chicago, R. I. & P. Ry., 83 Kan. 333, 111 P. 431, 30 L. R. A. (N. S.) 1071, the buyer after rejection was allowed to recover his profits on a resale of which the delay deprived him. Whether right or wrong, that decision has nothing to do with the damages here claimed. The explanation of the rule usually given, when any is vouchsafed, is that the cause of action is assigned by the rejection and acceptance along with the goods, but this is a fiction, because the buyer has ordinarily no intent about the matter.

If the buyer retains the cause of action after his rejection he gets it without any consideration, because the seller has paid the freight and by accepting the rejection has terminated his right to recover it, though it presumably entered into the purchase price. It is quite true that this is the result of the seller's own conduct, for he might have insisted upon payment; still his right to accept the rejected goods is unquestioned, and, in the absence of some express reservation by the buyer at the time of rejection, there is no reason either to impute to him any such purpose, or to clog the seller's right by limiting him to only a part of the consideration which he gave for the buyer's promise. Certainly the carrier's only interest is a good discharge. While, therefore, there is no assignment, properly speaking, the situation is one common enough, even in the law of contracts, where the law establishes the rights of the parties as justice demands, and covers what it does by a fiction.

[5] Therefore we conclude that upon the buyers' rejection of the 11 cases the plaintiff who accepted them might recover damages for breach of the contract of carriage. As to the other 63, the case stands somewhat differently. These the plaintiff took from the defendant, though with its consent, and forwarded to the buyers by better dispatch than the defendant would have made. True, he had strictly no right to substitute another carriage, or to make a new tender not prescribed in the contract, and perhaps the buyers were released, not being bound to accept a substituted performance.

Again, it is true that he did this before any breach by the buyers, so that it could not be said to be in minimization of his dam-

ages upon an existing breach. But the carrier was already in default, and the plaintiff's dispatch of the goods turned out better than if he had not acted. Just what the effect of his conduct might be, if the point had been urged, we need not say. So far as the record shows, no distinction was made between the cases rejected at Newark and those rejected at Havana. As to both classes the defendant merely complains that the plaintiff as consignor was in no position to sue, and that is the only point raised in the assignments of error; it is the only one we need consider.

[6] The indemnity agreement of December 1, 1920, did not, we think, release the defendant from the breach then existing. At that time it was already in default, as the jury has found, and it still held the cases, without any definite assurance as to when they should go forward. Before surrendering them, it was natural that it should demand some indemnity against the consequences of that act; but it was neither natural nor reasonable for it to expect a release from breaches already committed. The language seems to have been chosen with this distinction in mind. The plaintiff did not agree to indemnify the defendant generally, but only against claims made "for the merchandise," for which he agreed to be "responsible" and "to pay." The engagement appears to us to be limited to claims arising from the surrender, and to cover nothing else.

[7] The agreement of March 14, 1921, was more formal and clearer. It was made when the defendant paid back the freight, and was expressly limited to claims arising because of "the return of such moneys." While the transaction is not explained in the evidence, its purpose is not altogether obscure. The plaintiff had forwarded the goods by another ship and paid two freights; it was natural that he should wish to recover what he had originally paid the defendant. Prima facie, no doubt, the transaction has the appearance of a rescission, since at its conclusion neither party had performed. Were it not for its express form, we might find otherwise; but it was certainly capable of another interpretation, and that seems to be the true one. The defendant, having defaulted in proper dispatch, allowed the plaintiff to forward the goods in its place, which the plaintiff did at his own expense. All this might reasonably take place without abatement of any existing rights against the defendant. The plaintiff still remained out of pocket by the amount of the second freight

and the defendant had vicariously forwarded the goods. The foregoing does not account for the repayment of the freight upon the 11 cases, which had been rejected in October or November; but it does not appear that, when the plaintiff told the defendant that he wanted his goods back for reshipment, he excepted the 11 cases. Nor does it appear that he disclosed this on March 14, 1921. In the face of the words actually used, we think that this circumstance should not color the transaction, even as respects the 11 cases, though the plaintiff must, of course, abate his damages by the amount of the repaid freight.

[8] The limitation in the bills of lading as to the value of the cases was not effective. The plaintiff proved without contradiction that the defendant had no alternative rates, and it is only when there are such that the limitation is valid. Union Pac. Ry. v. Burke, 255 U. S. 317, 41 S. Ct. 283, 65 L. Ed. 656; Lawrence v. Compagnie Gen. Trans. (C. C. A.) 18 F.(2d) 930; Lehigh Valley R. R. v. State of Russia (C. C. A.) 21 F.(2d) 396. Whether in any event the limitation applied to loss through delay we need not consider.

[9, 10] That there was a variance we agree; the plaintiff laid his case upon the oral agreement in September, and proved only that at the trial. The defendant offered the bills of lading as the final form of the contract, and was right in its position, though the judge appears not to have taken that view. Yet, as we said at the outset, the obligation of reasonable dispatch was the same whichever contract was final, and it would be the merest formality to throw out the case because the plaintiff had mistaken his law. The defendant was not prejudiced in its defense, and had all the benefits of whatever the bills of lading contained. To-day a variance is no longer ipso facto ground for dismissal; under section 434 of the Civil Practice Act of New York, it is a fatal variance only in case the allegation is not proved "in its entire scope and meaning." Such was not the case here; the scope and meaning of the complaint was not entirely unproved, but only certain details of the contract and its form. These were rather "particulars" than complete departures. Besides, there being no motion to dismiss the complaint at the close of the whole case, the point is not well taken in any event.

[11-13] There remains the questions of damages and interest. Both sides agree that the proper rule is the difference in the market value of the goods when they should have been delivered with reasonable dispatch and

when in fact they were. The defendant asserts that there was no proof of what reasonable dispatch would have been on October 5, 1920, the day fixed by the judge in his charge. We do not agree. It was proved that the voyage was normally made in five days, with three for discharge. The harbor of Havana was indeed much crowded, and discharge was difficult; but plainly the question was one of fact as to how much this should have delayed delivery. The exclusion of the testimony of communications to the defendant by its Cuban agents, affecting the conditions at Havana, was clearly right. The defendant was charged with what its agents on the ground knew, regardless of what they told.

The precise period to be allowed for reasonable dispatch was indeed not important, because the situation gave much latitude in its determination without changing the result. The plaintiff proved that the market value of the goods was the same as the contract price when Levitt sold them in the spring, and, by Cohen, that market values remained substantially the same until December, though there was possibly a slight change in November. Thereafter they fell till, by the middle of December, such goods had no market whatever, though, of course, like any merchandise, they could be disposed of for something. The jury might therefore have found that reasonable dispatch included certainly the month of October, and probably November as well, and still they might have found the verdict which they did.

The 63 cases were delivered at the earliest on December 12th, by which time the market, properly speaking, was gone. Thereafter it was possible to find that they had only such value as could be got as salvage. Whether the plaintiff did the best he could, whether he should have brought more pressure on the buyers, or have thrown the rejected goods on such market as there was, without holding them for so long, these and all other questions, directed to the credits to which the defendant is entitled, are not for us; the verdict answers them.

The parties have submitted complicated calculations in attack upon and defense of the amount of the verdict. We need not do more than ascertain whether, on any proof, the jury might have found as much, and this, as the evidence was, comes down to whether, on the undisputed facts, the defendant was entitled to larger credits. The cases fell into three classes: The 11 left in New York, those finally accepted by the buyers, and those rejected. Of the first, $1,850.50 were sold for $1,144.48; the remaining cases, of the value of $2,800.25, were still unsold at the trial. These it was permissible to take at the same proportion of their invoice value as was realized on those actually sold—60 per cent. This left a loss upon the 11 cases of about $1,800.

The cases finally rejected at Havana had an invoice value of about $11,000, and $1,500 was realized out of them on the spot; but six, of the invoice value of about $1,500, were shipped back. The defendant asserts that the evidence did not justify the conclusion that the sum of $1,500 realized on the cases sold in Havana represented the sale of all the rejected cases, except the six returned. The evidence is too long to quote, but from it we think that it appears, or at least might have been found, that Levitt first sold $1,000 of these goods himself, and then turned over what remained for sale "on consignment." The bailee succeeded in getting only $500 from what he could sell, and returned all the rest to New York. Taking it so, the loss on the rejected goods was about $8,600.

The cases sent to Havana and eventually accepted had an invoice value of about $18,000, upon which the plaintiff made allowance of about $7,500, which prima facie was his loss. Besides this, there were expenses of disposition and forwarding by the substitute line of about $3,200, and the lost case was worth about $950. Thus the total loss which the jury might have found was about $22,000, less the returned freight, $1,400, or $20,600, which is very close to the actual verdict of $20,525.11.

[14] However, we think that the defendant is right in its challenge to the allowances made to two of the buyers, Daly Hnoz, $759, and Prieto Hnoz, $1,349. It is clear that there entered into these settlements some other allowances than on these particular goods, and, since the burden rested upon the plaintiff to prove his loss, he must suffer the doubt as to how much these contributed. Charles and Frank Levitt gave different versions of what happened in their dealings with the D. D. Manufacturing Company, and the jury was justified in accepting Charles, who swore that he could do nothing towards getting them to accept the goods. The defendant objected to the proof of what was the dividend in bankruptcy of another buyer, Maluf, and cannot now complain that it was not proved. The deductions to be allowed are therefore $2,108.

[15] As to interest, the rule has been increasingly broadened. The latest decision of the Court of Appeals of New York (Prager v.

N. J. F. & C. Co., 245 N. Y. 1, 156 N. E. 76) allowed it on a quantum meruit, though reserving the question of its propriety in actions "to recover damages for the violation of a duty." The uncertainty of the liability was as great in that case as in this. We allowed interest in Lehigh Valley R. R. Co. v. State of Russia (C. C. A.) 21 F.(2d) 396, where the difficulties of calculation were also as great as here, and in any event on May 1, 1922, the loss was calculable, even under the rule in Faber v. New York, 222 N. Y. 255, 118 N. E. 609. We think, therefore, that the court, in the exercise of a "sound discretion," might have allowed interest from the date selected. Miller v. Robertson, 266 U. S. 243, 257, 258, 45 S. Ct. 73, 69 L. Ed. 265.

Judgment reversed, unless the plaintiff files a remittitur for $2,108 and interest thereon; if he does, judgment affirmed.